**Denise C. SCOTT, Petitioner,**

v.

**BEHAVIORAL RESEARCH ASSOCIATES, INC., Respondent.**

No. 10–AA–1465.

District of Columbia Court of Appeals.

Submitted Dec. 16, 2011.

Decided May 17, 2012.

Denise C. Scott, pro se.

Donna MP Wilson, Bowie, MD, was on the brief for respondent.

Before GLICKMAN and OBERLY, Associate Judges, and REID, Senior Judge.

GLICKMAN, Associate Judge:

Petitioner Denise Scott worked as a care giver at a residential facility for disabled adults operated by respondent Behavioral Research Associates, Inc. ("BRA"). She applied for unemployment compensation after being fired for not cooperating satisfactorily with her employer's investigation into an incident she had witnessed involving a fight between two residents. Her application was denied, initially by a claims examiner and then, on her appeal to the Office of Administrative Hearings ("OAH"), by an Administrative Law Judge ("ALJ") after an evidentiary hearing. The claims examiner and the ALJ found Scott to be disqualified from receiving unemployment benefits because she was discharged for gross misconduct.

Scott challenges that determination; she denies any misconduct, gross or otherwise. We agree with her that the finding of gross misconduct cannot be sustained on the record before us. Whether Scott's termination resulted from misconduct on her part less serious than gross misconduct is a question we cannot answer, however, as material factual issues raised by the testimony at the OAH hearing remain unresolved. A determination that Scott was discharged for less serious or "simple"

misconduct still would subject her to a disqualification penalty, though a lesser one, under our unemployment compensation regime. Accordingly, we reverse the order of the OAH and remand for further findings regarding Scott's eligibility for unemployment benefits.

## I.

BRA is a nonprofit organization licensed by the District of Columbia Department of Disability Services ("DDS") to provide residential and other services for physically and mentally challenged individuals. Scott was hired by BRA in 2006 as a member of its Direct Care Staff. While working at BRA's Nannie Helen Burroughs Facility on March 20, 2010, Scott and at least one other co-worker witnessed an incident in which one resident slapped another. Scott promptly reported the altercation to a supervisor and submitted a written incident report.

As Andrea Jackson and Linda Graham, two BRA managerial employees, testified at the OAH hearing, BRA was required to investigate the March 20 incident, which it classified as client-on-client abuse, and submit a report on it to DDS's Incident Management Enforcement Unit. The investigation had to be completed within five days of the incident; Jackson and Graham referred to the source of this "five-day requirement" as either DDS policy or an unspecified "federal guideline."[1] DDS could terminate BRA's facility contract if BRA failed to complete a required investigation and make a timely report. BRA considered the failure of an employee to cooperate with an investigation to constitute grounds for termination of employment.

According to Jackson and Graham, BRA's protocol required employees in-

---

1. Neither witness identified any written documentation referring to the five-day require-

ment or otherwise describing investigation procedures that BRA was obligated to follow.

volved in an investigation (such as Scott and any co-workers who witnessed the assault) to give both a written and an oral statement. Scott essentially complied with each of these requirements on March 20, except that her oral report was made to a supervisor prior to the start of the investigation. Thereafter, apparently as a matter of routine procedure, Scott was placed on administrative leave pending the outcome of the investigation. It does not appear that Scott was considered to have been at fault in the incident.

The events that led to Scott's termination occurred after she was put on leave. Jackson, who served as a facility coordinator and incident management investigator for BRA, testified that she phoned Scott on March 20 and scheduled her to come to the office on March 23 for an investigative interview. Scott called her on March 23, however, to say she had an emergency and could not come in that day because she had to pick up a sick child from daycare. For whatever reason, Jackson did not reschedule the interview at that time. Instead, Jackson testified, Scott was supposed to call her back to make a new appointment. In response to the ALJ's direct inquiry, Jackson confirmed that she did not set a date or make any arrangements for Scott to reschedule. Jackson testified that Scott called her back on March 28 and left a message for her. Although Jackson received this message, she did not return Scott's call or speak with her at all until a month later, on April 28, 2010, the day BRA discharged Scott for not cooperating with the investigation.

Scott's phone call on March 28 fell outside the five-day period (which ended on March 25) in which, Jackson stated, the investigation was supposed to be completed. Jackson admitted that she did not mention this deadline to Scott. When the ALJ asked Jackson whether she had informed Scott of the five-day requirement, Jackson replied: "Everybody is informed. That's one of our policies [that is] elaborated on quite frequent[ly] in our in-service trainings." [2]

Scott testified that she called Jackson after the March 20 incident to ask when she could return to work, and Jackson told her she needed to come in to give another statement first. Scott told Jackson she would come in that same day, but she had to call back and cancel the meeting because of her family emergency. Scott testified that she called BRA numerous times thereafter but was unable to reach Jackson or anyone else handling the investigation. She asked Pamela Botts, her immediate supervisor at BRA, to help her, but Botts was not involved in the investigation and told Scott to keep trying to get through to Jackson. Scott, who was eager to resume working, left numerous messages, but no one ever returned her calls. [3]

Scott claimed that she did not know her interview had to be conducted within five days. Nonetheless, after finding herself unable to reschedule it with anyone at BRA, Scott visited DDS in person in order to give a statement there about the March 20 incident. Scott believed that by providing her written report on the day of the

---

2. There was no documentation of this. Linda Graham, who described herself as the "Qualified Mental Retardation Professional coordinator/program director" for BRA, identified a three-page "Orientation" document signed by Scott on June 6, 2006, when she was hired. This document does not address investigations and says nothing about the five-day requirement.

3. Scott denied that Jackson or Graham had tried to call her: "Had Ms. Graham or Ms. Jackson ... called me at any time," Scott testified, "I would have answered my phone because on a cell phone it ... tells you if you have a missed call or a voice mail. I have never received ... one call from there."

incident and a follow-up statement directly to DDS, she had fulfilled her obligations and would be able to return to work.

That was not to be. On April 28, 2010, when Scott finally reached her, Jackson told Scott that she would not be coming back to BRA at all. Subsequently, Scott received formal written notice from BRA that, "[a]s a result of not complying with an internal investigation involving the safety and well-being of an individual, your employment with Behavioral Research Associates, Inc. is terminated effective immediately as of April 28, 2010." [4]

Pamela Botts also testified at the OAH hearing. She confirmed that Scott called her at least half a dozen times (beginning, she recalled, within five days of the March 20 incident). Botts told Jackson, Graham, and other BRA officials about Scott's calls. Botts did not inform Scott that she had to come in for her interview within five days of the incident. "The normal procedure," Botts testified, "is not that everyone has to come in. To be honest with you, everybody doesn't have to come in and give statements."

In a post-hearing final order, the ALJ affirmed the claims examiner's determination that Scott was disqualified from receiving unemployment compensation benefits because she was fired for gross misconduct. The ALJ found that all BRA employees were informed during their training of BRA's obligation to complete investigations of suspected abuse

within five days of the incident, and that an employee could be terminated for not cooperating with such an investigation. That was the reason BRA discharged Scott, the ALJ found, reciting the facts that Scott cancelled her scheduled interview with Jackson on March 23, did not call Jackson back to reschedule it until March 28, and never did come in to work to discuss the March 20 client-on-client abuse incident. The ALJ thus concluded that Scott had disregarded the standards of behavior that BRA had a right to expect of her. And although this "may have been only an isolated incident" on Scott's part, the ALJ stated, it was "serious and egregious" enough to constitute gross misconduct in view of "the nature of the investigation and the fact that [Scott] worked with a vulnerable population of mentally and physically challenged individuals." Moreover, the ALJ added, Scott's "actions jeopardized [BRA's] opportunities to provide continued contract services with the District Government for mentally and physically challenged individuals."

In tension with the conclusion that Scott disregarded an expected standard of behavior, the ALJ also found that BRA "presented no evidence" of the specific rules or policies under which it had evaluated Scott's behavior, nor any evidence that it consistently had enforced such rules or policies.[5] And the ALJ made no finding as to whether Scott understood that her interview by Jackson had to be conducted

---

4. According to Graham, because Scott had not come in to be interviewed, DDS had told BRA to remove her from "all customer contact." If BRA had not removed Scott, Graham testified, it would have had to explain why not to DDS's Incident Management Investigative Unit.

5. The ALJ consequently concluded that Scott could not be disqualified from receiving unemployment compensation based on her alleged violation of BRA's rules (as distinct,

conceptually at least, from her disregard of the expected standard of employee behavior). *See* 7 DCMR § 312.7 (providing that "[i]f a violation of the employer's rules is the basis for a disqualification from benefits" due to either gross or simple misconduct, then it must be determined that: "(a) [ ] the existence of the employer's rule was known to the employee; (b) [ ] the employer's rule is reasonable; and (c) [ ] the employer's rule is consistently enforced by the employer").

within five days of the March 20 incident—something Jackson admittedly did not tell her, and which Scott denied knowing.

## II.

The legal principles that govern our review of the unemployment compensation ruling in this case are well-settled. In order to affirm an OAH decision, we must be satisfied that (1) the OAH made findings on each material, contested issue of fact, (2) substantial evidence supports each finding, and (3) the OAH's conclusions flow rationally from its factual determinations.[6] We defer to the ALJ's findings of fact as long as they are supported by substantial evidence, which is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[7] However, " '[i]f the [ALJ] fail[ed] to make a finding on a material, contested issue of fact, this court cannot fill the gap by making its own determination from the record, but must remand the case for findings on that issue.' "[8]

Under District of Columbia law, a terminated employee is ineligible to receive unemployment compensation benefits if the employer establishes by a preponderance of the evidence that the employee was discharged for misconduct.[9] The statute distinguishes between "gross misconduct" and "misconduct, other than gross misconduct," which our cases commonly refer to as "simple misconduct."[10] "A discharge for gross misconduct carries a more severe penalty and establishes more demanding requirements for regaining eligibility for benefits than does a discharge for simple misconduct."[11]

The statute does not define the term "misconduct," but "[w]e long have understood that not every act for which an employer justifiably may dismiss an employee will support the employee's disqualification from receipt of unemployment benefits because of misconduct."[12] In lieu of providing a definition, the statute directs the District of Columbia Unemployment Compensation Board to "add to its rules and regulations specific examples of behavior that constitute misconduct within the meaning of this subsection."[13] The regulations implementing that directive state that the term "gross misconduct" means

an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee.[14]

6.  *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180 (D.C.2006).

7.  *Id.* at 181 (internal quotation marks omitted).

8.  *Morris v. U.S. Envtl. Prot. Agency*, 975 A.2d 176, 181 (D.C.2009) (quoting *Brown v. Corr. Corp. of Am.*, 942 A.2d 1122, 1125 (D.C. 2008)).

9.  *Capitol Entm't Servs., Inc. v. McCormick*, 25 A.3d 19, 22 (D.C.2011); *see also* D.C.Code § 51–110(b) (2001); 7 DCMR §§ 312.2, 312.8 (2011).

10. *Capitol Entm't Servs.*, 25 A.3d at 22; *see also* D.C.Code § 51–110(b)(1)–(2).

11. *Capitol Entm't Servs.*, 25 A.3d at 22 & n. 4 (citing D.C.Code § 51–110(b)(1)–(2)).

12. *Id.* at 27 (footnote omitted).

13. D.C.Code § 51–110(b)(3).

14. 7 DMCR § 312.3. The regulations also provide illustrative examples of what gross misconduct may include, such as sabotage, arson, dishonesty, insubordination, repeated disregard of reasonable orders, use or possession of a controlled substance, willful destruction of property, and repeated absence or tardiness following warning. *Id.* § 312.4.

"Other than gross misconduct" is defined to include any other "act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest."[15] The term encompasses "those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct."[16]

■ Whether a fired employee's actions constituted disqualifying misconduct, gross or otherwise, is a legal question, and our review of the OAH's ultimate determination of that question is *de novo*.[17] In construing this ground for disqualifying an employee from receiving unemployment compensation, "decisions of this court [have made] it abundantly clear that an employee's actions must be intentional, deliberate, or willful to amount to gross misconduct."[18] This requirement is fully applicable where, as in the present case, a finding of gross misconduct is predicated on the employee's purported disregard of her obligations under expected standards of behavior.[19] We likewise have clarified that "intentionality or its equivalent (*e.g.*, conscious indifference to, or reckless disre-

gard of, the employee's obligations or the employer's interest) is an element" of simple misconduct as well.[20]

■■ "Crucially, however, the requirement that the dismissed employee acted intentionally is only a necessary, not a sufficient, condition for a finding of gross misconduct."[21] The examples of gross misconduct provided in the regulations— e.g., arson, insubordination, sabotage— demonstrate that "the types of conduct that constitute gross misconduct are narrower than what might come within a literal definition of that phrase."[22] In order to demonstrate that an employee's actions amounted to gross misconduct, more than "willful poor performance" must be shown[23]; an employer "must make a heightened showing of seriousness or aggravation, lest the statutory distinction between gross and 'simple' misconduct ... be erased."[24]

### III.

The foregoing principles preclude affirmance on the record before us of the OAH decision denying Scott unemployment compensation benefits. With respect to the finding of misconduct *vel non*, our review of the ALJ's ruling is impeded by the

---

15. *Id.* § 312.5.

16. *Id.*

17. *Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 424 (D.C.2009).

18. *Capitol Entm't Servs., Inc. v. McCormick*, 25 A.3d 19, 24 (D.C.2011).

19. *Id.*

20. *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 476 (D.C.2012); *see also Capitol Entm't Servs.*, 25 A.3d at 27 (holding "that an employee's ordinary negligence in failing to perform work in accordance with the employer's standards, rules, or expectations is not misconduct, gross or otherwise"); *Bowman–Cook v. Wash. Metro. Area Transit Auth.*, 16 A.3d 130, 135 (D.C.2011) (" '[I]mplicit in [the]

definition of 'misconduct' is that the employee *intentionally* disregarded the employer's expectations for performance.' ") (quoting *Washington Times v. D.C. Dep't of Emp't Servs.*, 724 A.2d 1212, 1217–18 (D.C.1999)); *Chase v. D.C. Dep't of Emp't Servs.*, 804 A.2d 1119, 1124 n. 12 (D.C.2002) (noting that a finding that the employee's misconduct was intentional "may be required even for a finding of simple misconduct").

21. *Odeniran*, 985 A.2d at 428.

22. *Id.* at 426.

23. *Id.* at 428.

24. *Doyle v. NAI Pers., Inc.*, 991 A.2d 1181, 1183 (D.C.2010).

absence of findings on critical factual issues. On the existing record, we are able to say that BRA presented insufficient evidence to support a finding that Scott was discharged for *gross* misconduct, and hence we reverse that determination, but we find it necessary to remand the case for further findings as to whether Scott's actions amounted even to *simple* misconduct. In a nutshell, that issue turns primarily on whether Scott intentionally disregarded a duty to come in for her interview within five days of the March 20 incident.

A. Insufficient Factual Findings

■ The ALJ's conclusion that Scott was discharged for gross misconduct rests on the determination that she disregarded a standard of behavior to which BRA reasonably expected her to adhere in connection with its investigation of the March 20 incident of client-on-client abuse. The ALJ arrived at that determination, however, without making necessary findings of fact on material issues in dispute. Specifically, the ALJ did not make sufficiently specific findings as to either (1) the standard of behavior that Scott allegedly disregarded and how she disregarded it, or (2) whether Scott's non-compliance with the standard was knowing and intentional. Absent those key findings, we cannot uphold the determination that Scott was discharged for misconduct (either gross or other than gross).[25]

To begin with, the ALJ made no findings as to exactly what standard of behavior or duty Scott allegedly disregarded or exactly how she did so. As to the standard or duty, the ALJ found only that BRA was "required to initiate and complete an investigation into any type of abuse within five days of the incident,"

that an employee's failure to cooperate during an investigation was grounds for termination, and that "[t]his information" was communicated to all employees during training. Almost paradoxically, however, the ALJ also found that BRA "presented no evidence concerning the specific rules and policies" against which it evaluated Scott's behavior. The important point is that, in the absence of such specificity, the ALJ made no findings as to precisely what "cooperation" was reasonably expected from Scott. BRA claimed that she should have come in for her interview at Jackson's direction within five days of the incident under investigation, i.e., by March 25, because it needed to complete its investigation by then. But was Scott reasonably expected to do so even when neither Jackson nor anyone else told her that her interview had to be conducted by that date, and Jackson simply left it up to Scott to get back to her at some unspecified point to reschedule the interview after the family emergency required Scott to postpone it? Especially given that Scott already had submitted a written report on the incident, and that she was not the only witness to it, was she supposed to know that BRA could not complete its legally-required investigation in five days without receiving more information from her? The record is silent as to what, if any, additional information BRA sought from Scott, whether Jackson told her that additional information was needed, or whether Scott knew she had more relevant information to provide. The ALJ resolved none of these issues. Without a clear finding as to the relevant workplace standard or duty against which Scott's conduct properly was measured, we cannot affirm a determination of misconduct for disregarding it.[26]

---

**25.** *See Badawi v. Hawk One Sec., Inc.,* 21 A.3d 607, 615 (D.C.2011) (holding that this Court could not affirm the ALJ's finding of gross misconduct because the ALJ failed to make

findings on every material, contested issue of fact).

**26.** *See Hegwood v. Chinatown CVS, Inc.,* 954 A.2d 410, 413 (D.C.2008) (holding, in a case

Relatedly, the ALJ did not make a clear finding as to the precise nature of Scott's misconduct. All the ALJ found was that Scott called Jackson on March 23 and told her she could not come in that day because she had a family emergency (the genuineness of which was not disputed); that Scott told Jackson she would call to reschedule; that Scott called Jackson and left a message for her on March 28; that Scott and Jackson did not speak again until April 28 (when Scott was terminated); and that Scott never did come in to work for the interview. But in what respect did Scott disregard her obligations to BRA? The final order does not say. Was it by cancelling her appointment on March 23? It would be problematic to call that misconduct absent a finding (which the ALJ did not make) that there was no emergency to justify postponing the interview.[27] Was it simply Scott's failure ever to arrange and come in for an interview? That also would be a problematic determination, given Scott's undisputed testimony (not addressed by the ALJ) that she made repeated calls to set up an interview at BRA and, when those calls were ignored, gave a statement to the DDS.

Most likely, the ALJ perceived that Scott disregarded her obligations to BRA by failing to call Jackson back and come in for an interview *on or before March 25.* But Scott denied knowing she had to come in for her interview within five days—a denial no witness expressly refuted. Absent such awareness on her part, Scott did not knowingly disregard her duty, and her failure to come in or call by March 25 (or any specific date) could not have been intentional. Hence it could not be found to have been misconduct of any kind.[28] Yet the ALJ made no finding that Scott possessed the requisite knowledge and intent; the finding that all BRA employees were informed as part of their training that investigations of abuse needed to be completed within five days did not suffice to answer the more specific question of what Scott understood regarding the need for her interview in this particular case. Without making specific findings that she knowingly and intentionally disregarded the five-day requirement (and that she did so without a valid excuse), the ALJ had no basis for a determination that Scott committed misconduct.[29]

### B. Misconduct, Gross or Simple

■ The lack of findings on the contested issues of material fact that we have identified means we must remand the case

---

in which the ALJ found the employer had failed to establish a rule violation under 7 DCMR § 312.7 but nevertheless determined the employer had established the employee's gross misconduct, that because there was "scant [evidence] as to the employer's written requirements pertaining to employee behavior," this Court could not "conclude [that] there was substantial evidence that [the employee had] violated the employer's rules in a manner that amounts to gross misconduct" under 7 DCMR § 312.3).

**27.** *Cf. Hamilton v. Hojeij Branded Food, Inc.,* 41 A.3d 464, 477 (D.C.2012) (recognizing that "excessive absences, where justified by illness or family emergency and properly reported to the employer, are not willful misconduct") (internal quotation marks omitted).

**28.** *See* footnote 20 and accompanying text, *supra.*

**29.** *See Bowman–Cook v. Wash. Metro. Area Transit Auth.,* 16 A.3d 130, 135 (D.C.2011) ("Without making a finding as to th[e] critical question [of the employee's notice], the ALJ had no basis for determining that" the employee intentionally violated the employer's requirement.); *see also Badawi,* 21 A.3d at 612 (holding that ALJ's failure to make findings on an issue relevant to employee's "state of mind and the deliberateness or willfulness of his actions" was a "critical omission" because employee's "state of mind was a critical factor in resolving the ultimate legal question of whether his conduct, as a matter of law, amounted to simple or gross misconduct").

to the OAH so that the necessary findings can be made. We entertain some doubt that substantial evidence exists in the record that would support findings justifying a conclusion that Scott was terminated for misconduct of any degree. Nonetheless, we do not sit as finders of fact, and we are not prepared to conclude that there is no possibility the requisite findings can be made, so we leave the question of simple misconduct to the OAH on remand in the first instance. Even assuming, however, that the ALJ can find that Scott intentionally disregarded her obligations to BRA in failing to come in for her interview within five days of the March 20 client-on-client abuse incident, we conclude as a matter of law that the record does not support a finding of gross misconduct, and we must reverse that holding.[30]

Under our case law, even if Scott's conduct was willful, it was not so "serious[ ] or egregious[ ]"[31] as to amount to gross misconduct. BRA did not present evidence that Scott's failure to cooperate with its investigation was a repeat offense. Nor did BRA demonstrate that its business had suffered or in fact was threatened with grave consequences as a result of Scott's conduct.[32] Indeed, if Scott may have fallen short in some respect, it cannot be

maintained that she refused to cooperate with the investigation entirely. It was Scott, after all, who reported the client-on-client abuse in the first place, and she promptly furnished a written report on the incident. BRA presented no evidence that her report was inadequate. In evaluating the significance of Scott's putative misconduct, the ALJ rightly emphasized "the nature of the investigation and the fact that [Scott] worked with a vulnerable population of mentally and physically challenged individuals." There is no evidence, however, that the investigation or the well-being of BRA's clients was compromised in any way by Scott's failure to come in for an interview, or even that she had any significant information to impart. In this regard, it is telling that Jackson, in charge of the investigation, expended minimal effort to obtain Scott's supplemental statement: Jackson did not try to reschedule the interview, tell Scott there was a deadline of any kind, or even return her calls. Furthermore, the ALJ's finding that Scott "jeopardized [BRA's] opportunities to provide continued contract services with the District Government for mentally and physically challenged individuals" is not supported by substantial evidence. There is no evidence that BRA's contract or li-

30. *See, e.g., Badawi,* 21 A.3d at 614 ("[I]n some instances where we have found that substantial evidence in the record dictated a different result as a matter of law, we have reversed without remanding for additional fact finding.") (citing *Odeniran v. Hanley Wood, LLC,* 985 A.2d 421, 425, 430 (D.C. 2009)); *Doyle v. NAI Pers., Inc.,* 991 A.2d 1181, 1185 (D.C.2010) ("[T]he ALJ may consider the lesser included issue of whether petitioner's conduct amounted to simple misconduct justifying the more limited denial of benefits under § 51–110(b)(2). But the finding of gross misconduct may not stand.") (internal quotation marks and citation omitted).

31. *Doyle,* 991 A.2d at 1184 (internal alterations and quotation marks omitted).

32. *See Odeniran,* 985 A.2d at 429 (reasoning that the employer had not demonstrated the employee was discharged for gross misconduct because it "did not present evidence that [the employee's] willful [violation] was other than an isolated incident, nor did it contend that its business had suffered serious consequences as a result"); *see also Doyle,* 991 A.2d at 1184 (holding that the employer had not demonstrated the employee was discharged for gross misconduct because the conduct "was an 'isolated incident' and [the employer] did not try to show that its staffing ability 'had suffered serious'—or indeed any— 'consequences as a result' of [the employee's]" conduct) (quoting *Odeniran,* 985 A.2d at 429).

cense was jeopardized. So far as appears, BRA submitted a satisfactory report of its investigation to DDS within the required time frame and the matter was closed.

Further, Scott's conduct pales in comparison to cases in which this Court has upheld findings of gross misconduct.[33] As in *Odeniran*, "we are aware of no published decision from this court holding that an employee was fired for gross misconduct for engaging in acts remotely comparable" to those here.[34] Even if Scott's failure to come in for an interview within five days constituted deliberate non-cooperation, her conduct was far more similar to behavior we have held insufficient to satisfy the exacting standard for gross misconduct.[35]

### IV.

For the foregoing reasons, we reverse the decision of the OAH that petitioner is

disqualified from receiving unemployment compensation benefits because she was discharged by her employer for gross misconduct. We remand the case for further findings, as described in this opinion, bearing on whether petitioner was discharged for simple misconduct because she disregarded a specific duty to cooperate with BRA's investigation, intentionally and without sufficient excuse. "Given that [BRA] bore the burden of proving misconduct of either kind, we see no need to reopen the hearing, thereby giving the employer a second bite at the proverbial apple; rather, the agency on remand shall make the necessary finding[s] based on the existing record."[36]

*So ordered.*

---

**33.** *See, e.g., D.C. Dep't of Mental Health v. Hayes*, 6 A.3d 255, 259 (D.C.2010) (holding that employee's conviction for possession of a controlled substance constituted gross misconduct); *Brown v. Hawk One Sec., Inc.*, 3 A.3d 1142, 1147–48 (D.C.2010) (affirming ALJ's finding of gross misconduct where employee, a high school special police officer, fought with another officer in the school hallway while both were on duty).

**34.** *Odeniran*, 985 A.2d at 429.

**35.** *See, e.g., Hickey v. Borners*, 28 A.3d 1119, 1131 (D.C.2011) (holding that employee's failure to timely "apprise [her employer] about days of expected absence throughout her employment and ... respond meaningfully to [employer's] request for information about the expected duration of her absence" constituted simple, not gross, misconduct); *Badawi*, 21 A.3d at 617 (holding that security guard's taking of unauthorized break, during which he placed his gun in a desk drawer at his security post (after removing the bullets), took off his shoes, and prayed briefly at his desk, constituted simple, not gross, misconduct); *Doyle*, 991 A.2d at 1182, 1184 (holding that employee's failure to comply with employer's rule requiring employees to notify employer when a temporary job placement ended did not constitute gross misconduct because the

violation "was an isolated incident and [employer] did not try to show that its staffing ability had suffered serious—or indeed any—consequences as a result of [employee's] unavailability") (internal quotation marks omitted); *Odeniran*, 985 A.2d at 422–23, 430 (holding that employee's "conscious decision to spend the day on the Internet instead of doing his job despite being chided more than once" constituted simple, not gross, misconduct); *Amegashie v. CCA of Tenn.*, 957 A.2d 584, 586, 589–90 (D.C.2008) (holding that correctional officer's contacting of inmate housed in correctional facility other than the one the officer staffed did not constitute gross misconduct because employer had not shown the officer "deliberately or willfully violated an unambiguous and consistently-enforced employer rule"); *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180–81 (D.C.2006) (affirming ALJ's determination that three instances of rude conduct toward customers by a retail employee constituted simple misconduct).

**36.** *Chase v. D.C. Dep't of Emp't Servs.*, 804 A.2d 1119, 1124 n. 13 (D.C.2002) (internal quotation marks, ellipses, and brackets omitted).