# District of Columbia
# Court of Appeals

**No. 14-AA-1086**

JACQUELINE LYNCH,

Petitioner,



F I L E D

NOV 25 2015

DISTRICT OF COLUMBIA
COURT OF APPEALS

v.

**DOES-196-13**

MASTERS SECURITY,

Respondent.

On Petition for Review of a Decision of the<br>Office of Administrative Hearings

BEFORE: Glickman and Thompson, Associate Judges; and Pryor, Senior Judge.

**J U D G M E N T**

This case was submitted to the court on the transcript of record, the briefs, and without presentation of oral argument. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the determination that appellant was disqualified from receiving unemployment benefits is reversed.

For the Court:

JULIO A. CASTILLO
Clerk of the Court

Dated: November 25, 2015.

Opinion by Associate Judge Phyllis D. Thompson.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-AA-1086

JACQUELINE LYNCH, PETITIONER,

v.

MASTERS SECURITY, RESPONDENT.

On Petition for Review from the
Office of Administrative Hearings
(DOES 196-13)

(Submitted October 16, 2015     Decided November 25, 2015)

*Drake Hagner* and *Jonathan Levy*, Legal Aid Society of the District of Columbia, were on the brief for petitioner.

*Edward R. Noonan* and *Jeffrey P. Brundage* were on the brief for respondent.

Before GLICKMAN and THOMPSON, *Associate Judges*, and PRYOR, *Senior Judge*.

THOMPSON, *Associate Judge*: This unemployment compensation matter is before the court again after a remand order in which we directed the Office of Administrative Hearings ("OAH") to consider, on the existing record, whether respondent Masters Security (the "Employer") proved the following by a

preponderance of the evidence with respect to the conduct that led the Employer to terminate petitioner Jacqueline Lynch from her job as an armed security guard:

> [That] leaving her weapon in a publicly accessible place[,] . . . is the kind of gross negligence that we have equated with intentionality due to the serious harm that could ensue[;] that is, whether the stated act constitutes highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.

*Lynch v. Masters Security*, 93 A.3d 668, 677 (D.C. 2014) ("*Lynch I*") (internal quotation marks omitted). In an August 29, 2014, Final Order after Remand, the OAH Administrative Law Judge ("ALJ") found that the record establishes that petitioner "committed an act of gross negligence in leaving a gun in a public restroom," that she was discharged for gross misconduct, and that she therefore is disqualified from receiving unemployment benefits. Petitioner challenges that ruling, arguing that her negligent conduct, though regrettable and dangerous, as a matter of law did not amount to gross negligence or to misconduct that disqualified her for unemployment benefits.

We agree with petitioner and therefore reverse the OAH ruling. As we explain more fully below, in light of our prior case law, several factors make a

conclusion of "misconduct" unwarranted here: (1) as we observed in *Lynch I*, petitioner "had not violated a company rule regarding the handling of her firearm," *id.* at 670; (2) the ALJ found that petitioner did not intentionally leave her firearm in the restroom; (3) the ALJ did not find that petitioner exhibited lack of concern for the safety of others (and there was evidence, credited by the ALJ, that petitioner did demonstrate such concern); (4) other security guards at the worksite had left their firearms in a public restroom (suggesting that such negligence is not extraordinary); and (5) those errant security guards were not terminated for that conduct, and there is nothing else in the record that supports an inference or a concern that petitioner did something that she had reason to know would result in her termination and (possible) qualification for unemployment benefits.

## I.

As recounted in *Lynch I* and briefly summarized here, petitioner worked for the Employer as a front lobby guard at the headquarters building of the United States Department of Health and Human Services ("HHS") headquarters. In that capacity, she carried a firearm issued by the Employer. January 14, 2013, was petitioner's first day back at work after taking a period of leave to care for her ailing mother. Petitioner's shift began at 8:00 a.m., but she arrived at work about

five minutes early, signed out her company-issued firearm, and then, shortly before reporting to her post in the front lobby, went to use a publicly accessible restroom located in a corridor behind the lobby.[1] When she entered a restroom stall, she removed her firearm from its holster, placing it on the shelf over the toilet paper dispenser in the stall. She explained at the hearing that this was her custom, and that of her female co-workers, because it was difficult for them as women to sit to use the toilet with a gun in the holster. Petitioner also explained that her practice was not to remove her entire gun belt and hang it on the door of the stall (she testified that most of the stall doors have no hooks) or place it on the floor, because either option would create an unsafe situation; as the ALJ found, petitioner was "concerned that someone could grab the gun from the outside of the stall" or that someone could reach under the stall wall to grab the belt and weapon from the floor.

On the morning in question, when petitioner exited the restroom stall, she failed to re-holster her firearm, instead leaving it on the shelf inside the stall. Minutes later, a fellow armed security guard, Irene Burton, entered the same stall,

---

[1] The ALJ found in the Final Order on Remand that "[a]nyone in the building who had passed through the security checkpoint had access to the rest room [which was located behind the lobby in a corridor], the door to which could not be seen from the security checkpoint." Petitioner testified that the location of the restroom is such that when members of the public are in the building, "they don't even see that restroom."

noticed the firearm, and gave it to petitioner's supervisor, Captain Timothy Nelson. Captain Nelson subsequently identified the firearm as the one petitioner had signed out, returned the weapon to her, and instructed her to return to her post. Petitioner explained to Captain Nelson that she had a lot on her mind and was distracted with worry about her ill mother.[2] She also explained, and the ALJ found on remand, that she was "in the habit of checking to see that she had re-holstered her weapon before she left the rest room stall, but she failed to do so on this occasion" because she was distracted. When Captain Nelson's superiors were notified of the incident, they initially instructed him to send petitioner home; later the same day, appellant was terminated for leaving her loaded weapon in a restroom.

A Department of Employment Services ("DOES") claims examiner thereafter denied petitioner's claim for unemployment benefits on the ground that she was terminated for gross misconduct. At the hearing on petitioner's appeal of that determination, Burton testified that she, too, had once left her firearm in a restroom at the HHS building but was not terminated.[3] Petitioner similarly

---

[2] The ALJ found that petitioner was worried "about whether she had made the right decision in agreeing to her mother's request to return home to live alone."

[3] Petitioner was the one who found the gun in the restroom and returned it to Burton. As the ALJ found, petitioner "did not report the incident, and [the]

(continued…)

testified, without contradiction, that other security guards at the site had left their guns in restrooms but had not been terminated.[4]

In a Final Order dated March 11, 2013, the OAH ALJ ruled that petitioner could not be denied benefits based on a rule violation (there was no evidence that petitioner violated a company policy regarding firearms), but found that petitioner's act of leaving her firearm in the restroom for (what the ALJ found was) fifteen minutes constituted gross misconduct that disqualified her from receiving unemployment benefits. The ALJ also denied petitioner's motion for reconsideration, in which she argued that her conduct could not constitute gross misconduct because it was unintentional. The ALJ found that petitioner's decision to report to work while distracted was "consciously reckless" and, therefore, amounted to gross misconduct.

---

(…continued)
officer was not disciplined." The ALJ further found that the "Employer did not consistently enforce any policy regarding leaving a handgun in a restroom."

[4] During questioning by the ALJ about what she would do if she found a fellow security officer's weapon in a restroom, petitioner testified that "[i]f I found somebody else's weapon, I would have secured it, . . . found the person who left it, pulled them [aside] and whispered . . . where I had [put] it[,] . . . and ma[d]e sure that they have it on the job for the next day." She added, in response to a cross-examination question about whether the proper procedure would be to turn the weapon in to Captain Nelson, that she and fellow officers "look out for one another, whether you say it is a proper procedure or not. . . . I'm going to make sure that a person has their job the next day."

This court reversed the ALJ's ruling because it was premised on a reason (reporting to work while distracted) that was not the Employer's stated reason for terminating petitioner. *Lynch I*, 93 A.3d at 677. We remanded the matter to the OAH, instructing the ALJ to consider the issue described in the introductory paragraph above.[5]

On remand, the ALJ found that petitioner's leaving the gun in the restroom, conduct that the ALJ found was "not fleeting" and that did not "self-correct," was misconduct within the meaning of the Act and was "sufficiently egregious" to take petitioner out of the protection of the Unemployment Compensation Act's humanitarian goals and "to require a finding of gross misconduct." The ALJ found that petitioner's "negligence shows substantial disregard sufficient to find misconduct not because of recurrence or evil design, but because she, an experienced security officer licensed to carry and use a gun, left a loaded 9 mm handgun unattended in a public space that she was employed to protect." The ALJ

---

[5] The Employer argues that this court concluded in *Lynch I* that petitioner's conduct constituted misconduct and remanded the matter "solely for a determination as to whether that misconduct was so egregious as [to] equate to intentionality" and thus gross (rather than simple) misconduct. That argument is incorrect; *Lynch I* left open the question of misconduct *vel non.* It is, of course, "for this court to construe its own mandate[.]" *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895).

found that as a professional licensed to carry a firearm, petitioner "was more than ordinarily aware of a gun's . . . destructive ability." The ALJ emphasized that petitioner had just returned from a leave of absence, and that "[s]uch an absence could reasonably take any employee out of his or her normal routine," a circumstance that "should, in a seasoned professional, have resulted in a heightened awareness of the dangers inherent in carrying a firearm." Instead, the ALJ found petitioner "disregarded that danger" by failing to pick up her weapon and check for it when leaving the restroom, thereby "creat[ing] a highly dangerous situation for a quarter of an hour."

The ALJ found "nothing in the record to suggest that [petitioner] placed her loaded gun on the shelf with the intent to leave it behind[,]" but reasoned that "a lack of intentionality is not the end of [the] analysis." Citing *Badawi v. Hawk One Sec., Inc.*, 21 A.3d 607, 614 (D.C. 2011), the ALJ further reasoned that it was appropriate to consider whether petitioner "'proffer[ed] evidence suggesting that [her] actions were sufficiently excusable to negate willfulness or deliberateness,'" i.e., a "good reason for what might otherwise be misconduct." Noting petitioner's explanation that she was distracted with personal problems at home, the ALJ did "not find this reason to be sufficiently excusable as to negate [petitioner's] reckless and conscious disregard of the harm to Employer's interests of failing to remove

her loaded weapon from an unsecured and publicly accessible bathroom." This putative mitigating factor, the ALJ concluded, "does not excuse creating a highly dangerous, in fact, potentially deadly situation in her workplace" that "directly undercut the purpose of the Employer's presence at HHS: to maintain safety in the building[.]" Finally, the ALJ observed that although petitioner's conduct was "not malicious or intentional," it "strains credulity to think such an immediate threat to the physical safety of those in the workplace caused by a claimant's disregard of her primary responsibility as a security guard would constitute anything less than misconduct[.]" Accordingly, the ALJ ruled that petitioner "remains disqualified from receiving [unemployment] benefits." This petition for review followed.

## II.

Under the Unemployment Compensation Act ("the Act"), a terminated employee is disqualified from receiving unemployment benefits if termination was the result of misconduct. D.C. Code § 51-110(b) (2012 Repl.). The Act recognizes two categories of misconduct: (i) gross and (ii) "other than gross," generally referred to as "simple misconduct." The implementing regulations define "gross misconduct" as:

> [A]n act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee.

7 DCMR § 312.3. Simple misconduct, on the other hand, is defined as:

> An act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer, a breach of the employment agreement or contract, or which adversely affects a material employer interest. The term "other than gross misconduct" shall include those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct.

7 DCMR § 312.5. If the employer asserts that misconduct was the basis for the employee's termination, the employer carries the burden of proving such misconduct. *See Amegashie v. CCA of Tennessee*, 957 A.2d 584, 587 (D.C. 2008); *see also* D.C. Code § 51-110(b)(1). "The fact that an employee's discharge appears reasonable from the employer's perspective does not necessarily mean that the employee engaged in misconduct." *Washington Times v. District of Columbia Dep't of Emp't Servs.*, 724 A.2d 1212, 1218 (D.C. 1999).

The scope of our review in unemployment compensation matters is limited, and, in general, if the ALJ's findings of fact are supported by substantial evidence,

and her conclusions flow rationally from these findings, we must affirm OAH's decision. *See Bowman-Cook v. WMATA*, 16 A.3d 130, 133 (D.C. 2011). However, we review questions of whether an employee's actions constituted misconduct *de novo*: "[w]hether a fired employee's actions constituted misconduct, gross or simple, is a legal question." *Gilmore v. Atlantic Servs. Grp.*, 17 A.3d 558, 562 (D.C. 2011) (internal quotation marks omitted). And while we "accord appropriate weight to the interpretation of a statute by the agency which is charged with its enforcement, and which therefore ordinarily has specialized expertise, . . . OAH is vested with the responsibility for deciding administrative appeals involving a substantial number of different agencies." *District of Columbia Office of Tax & Revenue v. BAE Sys. Enter. Sys.*, 56 A.3d 477, 480 (D.C. 2012) (internal quotation marks omitted). "Accordingly, OAH does not have 'subject matter expertise' that would warrant deference to OAH's determination" to whether the conduct that triggered an employee's termination was grossly negligent or constituted misconduct within the meaning of the Act. *Id.*

## III.

To reiterate, we remanded this matter to OAH

> with instructions that the ALJ consider whether the existing record reveals that [the Employer] proved by a preponderance of the evidence that [petitioner's] act of leaving her weapon in a publicly accessible place . . . is the kind of gross negligence that we have equated with intentionality due to the serious harm that could ensue, that is, whether the stated act constitutes highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.

*Lynch I*, 93 A.3d at 677 (internal quotation marks omitted). In the Final Order after Remand, the ALJ repeatedly emphasized the serious harm and high degree of danger that could have ensued from petitioner's conduct and characterized the conduct as egregious, but did not expressly find that petitioner's conduct amounted to an "extreme departure from ordinary care." Instead, the ALJ focused on petitioner's "substantial disregard" of her primary responsibility as a security guard, on the need for petitioner to have a "heightened awareness of the dangers inherent in carrying a firearm," and on whether petitioner's conduct was "sufficiently excusable to negate willfulness or deliberateness." We conclude that the ALJ's conclusion about "substantial disregard" does not flow rationally from her findings of fact; that the ALJ was understandably influenced by, but too narrowly focused on, the danger posed by petitioner's conduct; and that the ALJ veered off of the mandated course of considering whether petitioner's conduct

involved an extreme departure from ordinary care that can be equated with intentionality. We address each of these points in turn.

**A.**

This court has held that "intentionality or its equivalent (e.g., conscious indifference to, or reckless disregard of, the employee's obligations or the employer's interest) is an element of misconduct of any kind." *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 476 (D.C. 2012).[6] In this case, having accepted that petitioner's conduct of leaving the restroom without her firearm was "not

---

[6] *See also Scott v. Behav. Res. Assocs.*, 43 A.3d 925, 931 (D.C. 2012) ("intentionality or its equivalent (e.g., conscious indifference to, or reckless disregard of, the employee's obligations or the employer's interest) is an element of simple misconduct as well.") (internal quotation marks omitted); *Bowman-Cook*, 16 A.3d at 135 ("[I]mplicit in the definition of 'misconduct' is that the employee *intentionally* disregarded the employer's expectations for performance.") (internal quotation marks omitted) (emphasis in original); *Hickey v. Bomers*, 28 A.3d 1119, 1129 (D.C. 2011) (same); *Chase v. District of Columbia Dep't of Emp't Servs.*, 804 A.2d 1119, 1123 (D.C. 2002) (same).

We have held that although, grammatically, it may be argued whether the phrase "deliberately or willfully" in the regulation (7 DCMR § 312.3) defining "gross misconduct" applies to "disregard" of "the employee's obligation to the employer" or of the "standards of behavior which an employer has a right to expect of its employee," "the word 'disregard' carries within it the same [deliberately or willfully] requirement[.]" *Larry v. Nat'l Rehab. Hosp.*, 973 A.2d 180, 183 (D.C. 2009) (some internal quotation marks omitted); *see also Capitol Ent. Servs., Inc. v. McCormick*, 25 A.3d 19, 24 (D.C. 2011).

malicious or intentional," and was "not because of recurrence or evil design," and that "nothing in the record . . . suggest[s] that [petitioner] placed her loaded gun on the shelf with the intent to leave it behind," the ALJ did not go on to explain why she (implicitly) concluded that the conduct was the equivalent of intentional. That is, the ALJ did not explain how she concluded that petitioner acted with *conscious* indifference toward, or with *reckless disregard* for, her obligations to the Employer.

"Conscious indifference" means "a deliberate lack of interest in or concern." Black's Law Dictionary 891 (10th ed. 2009). "Recklessness" is a "state of mind in which a person does not care about the consequences of his or her actions." *Id.* at 1462. It requires a "'choice of a course of action.'" *In re Romansky*, 825 A.2d 311, 316 (D.C. 2003) (quoting 57 Am. Jur. 2d Negligence § 302). To "disregard" is to "ignore or treat as unimportant." Black's Law Dictionary 573.[7]

---

[7] These or substantially similar definitions are reflected in case law from many courts and in many contexts. *See, e.g.*, *United States v. Kalu*, 791 F.3d 1194, 1209 (10th Cir. 2015) ("[To] act with 'reckless disregard' means to be aware of, but consciously and carelessly ignore, facts and circumstances."); *United States v. Jones*, 735 F.2d 785, 790 (4th Cir. 1984) ("Reckless disregard means the closing of the eyes to or deliberate indifference toward the requirements of a mandatory safety standard, which standard the defendant should have known and had reason to know at the time of the violation.") (internal quotation marks omitted); *Schwartz v. Sears, Roebuck & Co.*, 669 F.2d 1091, 1903 n.2 (5th Cir. 1982) ("'Heedless and
(continued…)

The ALJ found that petitioner was "concerned that someone could grab the gun from the outside of the stall" if she placed the gun on the stall door while using the restroom. Having so found, and having made no other finding that appellant exhibited inadequate concern about the safe handling of weapons,[8] the ALJ could not reasonably conclude that, as the above definitions require, petitioner exhibited

---

(…continued)

reckless disregard' means more than momentary thoughtlessness, inadvert[e]nce, or error of judgment. It means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it."); *Phillips v. C.R. Bard, Inc*., No. 3:12-cv-00344-RCJ-WCG, 2014 U.S. Dist. WL 7177256, at *11 (D. Nev. Dec. 16, 2014) ("'Conscious disregard' means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences."); *State v. Consaul*, 332 P.3d 850, 857 (N.M. 2014) ("[R]eckless disregard means the defendant 'knew or should have known the defendant's conduct created a substantial and foreseeable risk, the defendant disregarded that risk and the defendant was wholly indifferent to the consequences of the conduct."); *Simon v. San Paolo U.S. Holding Co., Inc.*, 113 P.3d 63, 76 (Cal. 2005) ("[C]onscious disregard means 'that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences.'"); *State v. Carpenter*, 378 P.2d 188, 190 (Idaho 1963) (construing the statutory term "reckless disregard" to mean "'an act or conduct destitute of heed or concern for consequences.'").

[8] The ALJ did not, for example, draw from petitioner's testimony described in note 4 *supra* — that if petitioner found a fellow security officer's weapon in the bathroom, she would secure and arrange for the return of the weapon, but would not report the incident to her superiors, so as to "make sure that [the fellow security guard] has their job the next day" — an inference that petitioner was inadequately heedful of the safety of persons who might be injured as a result of such a fellow officer's continuation on the job after such negligence.

a "deliberate lack of interest in or concern" about her responsibilities as a security officer, or that she "ignore[d] or treat[ed] as unimportant" the need to handle her weapon safely. For that reason, we are constrained to conclude that the ALJ's conclusion that petitioner's conduct "shows substantial disregard sufficient to find misconduct" does not flow rationally from the Findings of Fact.[9]

**B.**

We explained in *Lynch I* that "gross negligence or reckless disregard of the consequences, . . . is typified by highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger

---

[9] We reasoned in *Capitol Entertainment* that an employee might exhibit "negligence in such degree or recurrence as to manifest…an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer[,]" 25 A.3d at 28 (internal quotations omitted) (quoting *Hickenbottom v. District of Columbia Unemployment Comp. Bd.*, 273 A.2d 475, 477-78 (D.C. 1971)). The only example we provided was a summary of the facts involved in a Maine case, which we described as addressing a "tractor-trailer driver's aggravated negligence in ramming a vehicle she was attempting to pass on the highway, causing personal injury to the vehicle's driver and extensive property damage." *Id.* at 28 n.37 (citing *Forbes-Lilley v. Maine Unemployment Ins. Comm'n*, 643 A.2d 377 (Me. 1994)). That summary demonstrates that the critical fact about the conduct involved there was that the tractor-trailer driver was *deliberately* attempting to pass the other vehicle, conduct that presents some danger. The example does not at all suggest that petitioner's undisputedly unintentional conduct of forgetting to retrieve her gun from the shelf in the restroom stall amounts to substantial disregard of the employer's interest.

is apparent." 93 A.3d at 675 (quoting *Hickenbottom*, 273 A.2d at 477-78 (internal quotation marks omitted). Thus, as petitioner correctly argues, we articulated a two-factor test, focusing on whether there was (1) an extreme departure from ordinary care and (2) a high degree of danger. We agree with petitioner that the ALJ appears to have conflated the two factors, giving undue weight to the (undeniable) danger posed by petitioner's conduct. Yet, we conclude, dangerousness standing alone cannot support a finding of misconduct for purposes of the unemployment statute and regulations.[10]

The history of the misconduct provisions of our unemployment statute reveals that their purpose is to "prevent dissipation of [unemployment insurance] funds due to disqualifying acts rather than lack of suitable job opportunity."

---

[10]    In *Badawi*, 21 A.3d 607, where a lobby security guard unloaded his weapon and placed the gun and bullets in a drawer while he prayed, his inattention to his guard duties was dangerous, but not just dangerous; it also was willful and deliberate, and thus constituted misconduct. In contrast, in *Keep v. District of Columbia Dep't of Emp't Servs.*, 461 A.2d 461 (D.C. 1983), where a babysitter was terminated for conduct that included allowing a small child to chew on wire garbage ties and neglecting to strap him into a stroller, we held that this (dangerous) conduct was not "sufficiently willful to meet the statutory definition of misconduct." *Id.* at 463.

*Hickenbottom*, 273 A.2d at 477;[11] *Jones v. District of Columbia Unemployment Compensation Board*, 395 A.2d 392, 395 (D.C. 1978) (same).  Consistent with that purpose, the types of wrongdoing encompassed in the regulatory definition of misconduct "*impute knowledge to the employee that* should he proceed he will damage some legitimate interest of the employer for which *he could be discharged*."  *Capitol Entertainment*, 25 A.3d at 25 (italics added; internal quotation marks and brackets omitted).  That is, the definition of misconduct, which gives examples of disqualifying conduct that are of varying degrees of seriousness (compare, e.g., "arson" with "repeated . . . tardiness following warning") focuses not on the relative blameworthiness (e.g., dangerousness) of employee conduct, but on conduct that an employee can expect with certainty, or can be reasonably sure, will cause him to be terminated.[12]  Thus, the definition of disqualifying "misconduct" guards against an employee's deliberately proceeding with such acts in order to get fired and (possibly) gain access to unemployment compensation.  That being the case, there is no sound rationale for concluding that,

---

[11]    We have said that *Hickenbottom*, which interpreted an earlier version of our unemployment statute, "retain[s] [its] relevance." *Capitol Entertainment*, 25 A.3d at 26 (internal quotation marks omitted).

[12]    This makes appropriate the mandate of 7 DCMR § 312.7 "that violation of a rule may support a denial of benefits only if the rule was known to the employee, reasonable, and consistently enforced." *Capitol Entertainment*, 25 A.3d at 27.

where an employee has been negligent in handling the instruments of his work, the high degree of danger posed by those instruments must disqualify him for unemployment benefits, if there is no basis for "imput[ing] knowledge to the employee that[,] should he proceed," he is likely (or certain) to be discharged.

For that reason, we think it relevant here that petitioner testified, and the Employer did not disprove, that other security officers had left their weapons in restrooms without being terminated.[13]  Indeed, as the ALJ found, Captain Nelson initially returned petitioner's weapon to her, and when the incident was reported to his superior, Major Battle, Battle instructed Nelson to send petitioner home for the day while the Employer "considered what discipline to impose on her."  It thus appears that it was unclear that petitioner would face termination for her negligent conduct.  In short, the record provides no basis for concern that petitioner would have been motivated toward laxity in safeguarding her (dangerous) loaded firearm

---

[13]    In her Reply Brief, petitioner cites several news articles about police officers in this jurisdiction, or elsewhere in the country, who left their guns in public restrooms and who were disciplined through suspensions and remedial training (rather than termination).  Petitioner argues that the frequency of these incidents indicates that incidents such as the one in issue here do not involve an extreme departure from ordinary care, but instead common negligence.  We do not rely on these articles because they were not part of the OAH record, but we acknowledge their possible relevance to whether, on the day she was discharged, petitioner could have expected to be terminated for inadvertently leaving her weapon in a public restroom.

in order to trigger her termination and (possible) qualification for unemployment benefits.

## C.

The ALJ premised her ruling on the need for petitioner to have a "heightened awareness of the dangers inherent in carrying a firearm" because of her recent absence from work that took her "out of . . . her normal routine."  The ALJ did not explain the basis for imposing this "heightened awareness" standard — under which, we presume, petitioner would have had a duty to be more cautious than her fellow security guards who had not just returned from a leave of absence — and it appears not to be grounded in the law of this jurisdiction.[14]  We have said, in other contexts involving whether a party was negligent, that "[t]his jurisdiction does not recognize varying standards of care . . . but always requires reasonable care to be exercised under all the circumstances."[15]  The ALJ found that petitioner deviated from a "heightened awareness" standard, but, as we explain below, did

---

[14]  Moreover, at least arguably, by using this standard, the ALJ once again focused improperly on what state of mind petitioner had when she came to work.

[15]  *Pannu v. Jacobson*, 909 A.2d 178, 194 (D.C. 2006) (internal quotation marks omitted).

not adequately address what our remand order required: whether petitioner deviated from *ordinary care* in a manner so egregious as to show "an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer." *Capitol Entertainment*, 25 A.3d at 28.

**D.**

The ALJ concluded that petitioner's conduct amounted to gross negligence, i.e., "an extreme departure from ordinary care."[16] *Lynch I*, 93 A.3d at 677. Yet, gross negligence "requires such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others[,]" *Capitol Entertainment*, 25 A.3d at 28 n.36 (quoting *District of Columbia v. Walker*, 689 A.2d 40, 44-45 (D.C.

---

[16] The ALJ also concluded that petitioner's "discharge resulted from her act of gross misconduct." But, "[i]n order to conclude that the employee engaged in gross misconduct under our statutory scheme, the ALJ must first find that the employee acted deliberately or willfully." *Badawi*, 21 A.3d at 614; *see also Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 428 (D.C. 2009) ("[T]he requirement that the dismissed employee acted intentionally is . . . a necessary . . . condition for a finding of gross misconduct.").

1997) (internal quotation marks and brackets omitted)),[17] a conclusion that we have explained above is not justified on the factual record. We have said elsewhere that the fact that a party took steps to ensure safety and security militates against a finding of gross negligence. *See Mefford*, 728 A.2d at 609.[18] Here, as the ALJ found, although petitioner negligently failed to do so on the day she was terminated, she was "in the habit of checking to see that she had re-holstered her weapon before she left the rest room stall." The ALJ also credited petitioner's testimony that her reason for placing her gun on the shelf above the toilet paper dispenser was to guard against its being grabbed by someone else. In short, the record does not support a conclusion that petitioner exhibited wanton disregard for the safety of others.

---

[17] "This [gross negligence] standard has been held to connote that the actor has engaged in conduct so extreme as to imply some sort of bad faith." *Walker*, 689 A.2d at 44; *see also Mefford v. District of Columbia*, 728 A.2d 607, 609 (D.C. 1999) (construing statutory term "gross negligence" to mean "a willful intent to injure. . ., or a reckless or wanton disregard of the rights of another.") (internal quotation marks omitted).

[18] *See also District of Columbia v. Henderson*, 710 A.2d 874, 876 (D.C. 1998) (holding that no reasonable juror could find gross negligence where the evidence was that "[t]he evening was dark enough that other vehicles . . . had their headlights on; [Officer] Davis went one step further and activated his high-beam headlights. Additionally, Davis applied his brake as he entered the intersection. It is regrettable that the officer did not avoid the crash, but his conduct simply did not reflect 'such an extreme deviation from the ordinary standard of care as to support a finding of wanton, willful and reckless disregard or conscious indifference for the rights and safety of others.'") (emphasis omitted).

We have explained that a "finding of gross negligence, if such standard is to be meaningfully distinguished from simple negligence, must demand serious aggravating factors in [a party's] conduct . . . beyond those necessary to establish simple negligence in the first place." *Henderson*, 710 A.2d at 877; *see also Scott*, 43 A.3d at 931 ("In order to demonstrate that an employee's actions amounted to gross misconduct, . . . an employer must make a heightened showing of seriousness or aggravation, lest the statutory distinction between gross and 'simple' misconduct . . . be erased.") (internal quotation marks omitted). "'[B]ona fide forgetfulness,'" though, which is what occurred here, is ordinary negligence. *Association of American R.Rs. v. Connerton*, 723 A.2d 858, 862 (D.C. 1999); *see also Gonzalez v. Duncan*, 551 F.3d 875, 886 n.10 (9th Cir. 2008) (forgetting to register as a sex offender is "ordinary negligence"); *Montalvo v. Williams*, No. 97-41340, 1998 U.S. App. WL 858830, at *1 (5th Cir. Nov. 20 1998) (forgetting to give diabetic insulin injections was "merely negligent"); *Hosely v. Knipp*, No. 2:13-cv-00962-KJM-GGH, 2014 U.S. Dist. WL 3385187, at *10 (E.D. Cal. Jul. 10, 2014) ("There is simply no logical way around the fact that if one does not perform a required act because the requirement is innocently or negligently erased from one's consciousness for a time, the person 'forgets' in common parlance, negligently or without culpability."); *Luck v. Fox*, No. 1:09cv335 (AJT/JFA), 2009

U.S. Dist. WL 1172860, at \*5 n.3 (E.D. Va. Apr. 28, 2009) (nurse's alleged three-day failure to order antibiotics "because she forgot is at worst simple negligence, not 'gross' negligence.").

Exercising *de novo* review and considering the findings the ALJ made and the inferences she drew, we cannot conclude that petitioner's (unquestionably negligent) conduct involved an "extreme departure from ordinary care."[19] It was petitioner's first day back at work. She went to the restroom just before her shift started. Thus, she had not been at work long enough to perceive that her distraction because of concern about her mother was adversely affecting her work. As already described, she placed her gun on the shelf in the restroom stall where she customarily placed it in order to safeguard it against theft or mischief by a third

---

[19] "Generally speaking, whether a discharged employee's conduct involved gross negligence or recklessness as opposed to ordinary negligence is a question of fact for. . .the administrative law judge to determine." *Capitol Entertainment*, 25 A.3d at 28. We conclude, however, as a matter of law that the record before us will not support a finding of gross negligence or recklessness.

We presume that the Division of this court that remanded the matter to OAH did so out of an abundance of caution, contemplating the possibility that, from the existing record, the ALJ might make additional findings and draw additional inferences bearing on whether petitioner's conduct could be said to have involved an extreme departure from ordinary care (for example, an inference of the sort described in footnote 8 *supra*). It appears, however, that the ALJ drew no additional factual inferences. Thus, on the factual record as it remains, this is not a "case that could conceivably support a finding either way." *Benjamin v. Washington Hosp. Ctr.*, 6 A.3d 263, 268 (D.C. 2010).

party. Thus, she was not "indifferent to safety." *Capitol Entertainment*, 25 A.3d at 28. She also was not the first female officer to inadvertently leave her weapon in the restroom, a fact that provides some additional support for a conclusion that her negligence was garden-variety and ordinary. Such "ordinary negligence in failing to perform work in accordance with the employer's standards, rules, or expectations is not misconduct, gross or otherwise, within the meaning" of the Act. *Id.* at 27.

## IV.

For all the foregoing reasons, we are unable to sustain the ALJ's ruling on remand. The record does not support that petitioner was discharged for conduct that was misconduct for purposes of the unemployment statute and regulations. Accordingly, the determination that she was disqualified from receiving unemployment benefits is

*Reversed*.