*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 20-AA-0480

FORT MYER CONSTRUCTION CORPORATION, PETITIONER,

v.

CARROLL D. BRISCOE, RESPONDENT.

Petition for Review of an Order of the
District of Columbia Office of Administrative Hearings
(2020-DOES-001625)

(Argued February 8, 2023                    Decided August 3, 2023)

*Joseph E. Schuler*, with whom *Diana M. Caldas* was on the briefs, for petitioner.

*Rebecca Steele*, with whom *Jonathan H. Levy*, *Mariah Hines*, and *Nicole Dooley* were on the briefs, for respondent.

Before MCLEESE and DEAHL, *Associate Judges*, and GLICKMAN, *Senior Judge*.

Opinion for the court PER CURIAM.

Opinion by *Associate Judge* MCLEESE, concurring in part and dissenting in part, at page 23.

PER CURIAM: The case involves competing challenges to a finding that respondent Carroll D. Briscoe was discharged for simple workplace misconduct,

partially disqualifying him from receiving unemployment-compensation benefits. His former employer, petitioner Fort Myer Construction Corporation, argues that Mr. Briscoe was actually discharged for gross misconduct within the meaning of D.C. Code § 51-110(b)(1), fully disqualifying him from receiving unemployment benefits. Mr. Briscoe, meanwhile, argues that he did not commit misconduct at all, and that he is therefore entitled to receive full benefits. We disagree with each party's challenges and affirm the Office of Administrative Hearings' ruling.

## I. Factual and Procedural Background

Certain basic facts appear to be undisputed for current purposes. Mr. Briscoe worked for Fort Myer as a division superintendent. His responsibilities included review and approval of time sheets ("tickets") for division employees. Division employee Kendra Ginyard complained to Mr. Briscoe at one point that she had been removed from the Sunday schedule, an assignment for which Ms. Ginyard would have received double pay. Ms. Ginyard, a Black woman, complained that it was unfair that the shift at issue was instead given to a white male employee.

Mr. Briscoe contacted Paolo Spada, who was responsible for creating the work schedule for division employees, to ask why Ms. Ginyard was not scheduled

to work that Sunday. The details of the discussion between Mr. Briscoe and Mr. Spada are disputed, but the outcome of the discussion was that Ms. Ginyard was given a ticket reflecting that she worked on the Sunday at issue even though she had not done so. After discovering the time-sheet discrepancy shortly thereafter, Fort Myer discharged Mr. Briscoe for misappropriation of resources. The company also discharged Ms. Ginyard, while Mr. Spada received a one-day suspension for following Mr. Briscoe's directive.

Mr. Briscoe sought unemployment-compensation benefits. A claims examiner concluded that Mr. Briscoe was qualified to receive such benefits because Fort Myer had not presented evidence showing that Mr. Briscoe had engaged in misconduct. Fort Myer appealed that decision to the Office of Administrative Hearings (OAH), arguing that Mr. Briscoe had engaged in gross misconduct.

An OAH Administrative Law Judge (ALJ) held an evidentiary hearing. At the hearing, Mr. Spada testified that Mr. Briscoe had directed him to sign the ticket for Ms. Ginyard. A Fort Myer official also testified that Mr. Briscoe had not denied directing Mr. Spada to sign the ticket.

Mr. Briscoe's testimony at the hearing included the following. Ms. Ginyard complained to him that she had been on the schedule for Sunday but had been removed and replaced by a white male. Mr. Briscoe asked Mr. Spada why he had done that, but Mr. Spada was unable to explain his decision. Mr. Briscoe was concerned that the change in schedule was impermissible and probably would require Fort Myer to pay Ms. Ginyard for the shift even though she had not worked. Mr. Briscoe did not direct Mr. Spada to give Ms. Ginyard a Sunday ticket. Rather, Mr. Briscoe told Mr. Spada that Fort Myer would probably have to pay Ms. Ginyard, but he advised Mr. Spada not to take further action until Mr. Spada talked to a "higher level" superintendent.

The ALJ concluded that Mr. Briscoe had engaged in simple misconduct and was therefore temporarily disqualified from receiving unemployment benefits. Crediting Mr. Spada's testimony, and discrediting Mr. Briscoe's testimony to the contrary, the ALJ found that Mr. Briscoe had directed Mr. Spada to sign Ms. Ginyard's ticket. Because the ALJ further found that Mr. Briscoe's conduct was against Fort Myer's interests, the ALJ concluded that Mr. Briscoe had engaged in misconduct.

The ALJ concluded, however, that Mr. Briscoe's conduct "did not demonstrate the degree of extreme culpability . . . required for gross misconduct." The ALJ relied on the following factors in reaching that conclusion: there was no evidence that Mr. Briscoe's behavior had a significant adverse impact on Fort Myer's operations; the issue was caught before Ms. Ginyard was paid for the shift at issue; the incident was isolated in nature; and Mr. Briscoe did not personally benefit from his actions.

Fort Myer sought review in this court, and this court remanded the record for the ALJ to make an explicit finding as to whether Mr. Briscoe's actions were motivated by a desire to protect Fort Myer's interests. *Fort Myer Constr. Corp. v. Briscoe*, No. 20-AA-480, Mem. Op. & J. at 2 (D.C. Aug. 18, 2021).

On remand, the ALJ held a further evidentiary hearing. Mr. Briscoe's testimony at that hearing included the following. Mr. Briscoe spoke with Mr. Spada about the change to Ms. Ginyard's work schedule because Ms. Ginyard was threatening to raise a discrimination complaint. Mr. Briscoe was concerned about that possibility in light of an incident from two or three months earlier in which a Fort Myer supervisor had made a racially discriminatory comment to Mr. Briscoe. Two different Fort Myer supervisors dissuaded Mr. Briscoe from filing a complaint

based on that comment, because doing so would or might cause Fort Myer to shut down. Specifically, Mr. Briscoe was told that Fort Myer had just undergone a federal investigation into discrimination incidents and that filing a complaint might lead to "a padlock on the gate."

Mr. Briscoe believed that paying Ms. Ginyard for a day on which she did not work would resolve any potential discrimination complaint that Ms. Ginyard might have. Mr. Briscoe had seen supervisors who, unlike him, "ran the asphalt division," take that course of action in resolving similar complaints. For example, Mr. Briscoe described an incident in which an employee made a complaint about being removed from the work schedule, the employee threatened to raise a discrimination claim, and the supervisor who ran the asphalt division directed that the employee be paid even though the employee had not worked. Consistent with that practice, Mr. Briscoe maintained that he did not direct Mr. Spada to sign the ticket but instead told him to talk to a higher-level supervisor before doing so. Mr. Briscoe did not intend to harm Fort Myer, but rather "was trying to take care of [his Fort Myer] family."

Mr. Briscoe acknowledged that he did not take steps to verify or investigate Ms. Ginyard's complaint. He also acknowledged that he was not sure whether what happened to Ms. Ginyard was the result of discrimination or favoritism for a friend.

Hector Sealey, Fort Myer's training director, testified that Fort Myer requires all employees to take annual anti-discrimination training. Employees are instructed that there is zero tolerance for discrimination and that complaints must be reported to supervisors, to the union, and to the head of the human-resources department. The training materials explained that such reporting protects the company and permits the company to address alleged discrimination. Mr. Sealey was not aware of employees having been told not to report claims of discrimination. Mr. Sealey testified that, during Fort Myer's internal discipline process, Mr. Briscoe admitted that he had decided to pay Ms. Ginyard for hours Ms. Ginyard did not work. Mr. Briscoe did not mention the concern that Ms. Ginyard had been discriminated against. Finally, Mr. Sealey testified that written authorization was required for submitting a timecard for hours an employee did not work.

After the hearing, the ALJ issued a new ruling. The ALJ reiterated the earlier finding that Mr. Briscoe had directed Mr. Spada to sign Ms. Ginyard's ticket, again discrediting Mr. Briscoe's testimony that he instead instructed Mr. Spada to speak with another supervisor before doing so. The ALJ credited Mr. Briscoe's testimony in other respects, however, finding that (1) several months before the incident with Ms. Ginyard, a Fort Myer supervisor made a racist comment to Mr. Briscoe; (2) two

different Fort Myer supervisors discouraged Mr. Briscoe from filing an external complaint about the racist comment made to him, because doing so could lead to Fort Myer being shut down; (3) Mr. Briscoe was concerned that Ms. Ginyard might file a claim of discrimination; (4) Mr. Briscoe was motivated by his belief that another complaint of discrimination could shut Fort Myer down; and (5) Mr. Briscoe had seen management correct pay issues under similar circumstances and thought he could do likewise.

Based on those findings, the ALJ reaffirmed its prior conclusion that Mr. Briscoe committed misconduct but not gross misconduct. Describing Mr. Briscoe's conduct as "attempted misappropriation of funds," the ALJ concluded that Mr. Briscoe had "violat[ed]" Fort Myer's "interest and expectation of its employees." The ALJ did not view Mr. Briscoe's conduct as gross misconduct, however, for several reasons: the conduct did not have a significant adverse effect on Fort Myer's operations; no resources were misappropriated; the conduct was an isolated incident; Mr. Briscoe was motivated in part by a desire to avoid a discrimination complaint that could shut down Fort Myer; Mr. Briscoe did not personally benefit; and Mr. Briscoe had seen other Fort Myer supervisors correct pay issues in similar circumstances.

## II. Analysis

This court will affirm an agency's decision "if the decision contains findings on each material, contested issue of fact; substantial evidence supports each factual finding; the decision's legal conclusions flow rationally from the factual findings; and the decision is not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." *Tyler v. George Washington Med. Fac. Assocs.*, 75 A.3d 211, 213 (D.C. 2013). "We defer to the ALJ's factual findings if they are supported by substantial evidence, but legal conclusions, including whether a fired employee's conduct constitutes misconduct, are reviewed *de novo*." *Id.* (internal quotation marks omitted).

A former employee who has been terminated for misconduct is disqualified from receiving certain unemployment benefits, with the extent of the disqualification depending on the gravity of the misconduct. D.C. Code § 51-110. "Misconduct" is not defined in § 51-110. Applicable regulations define "gross misconduct" as "an act which deliberately or willfully violates the employer's rules, deliberately or willfully threatens or violates the employer's interests, shows a repeated disregard for the employee's obligation to the employer, or disregards standards of behavior which an employer has a right to expect of its employee." 7 D.C.M.R. § 312.3.

Theft and attempted theft are listed as conduct that "may" constitute gross misconduct. *Id.* § 312.4(d). The regulations define "[o]ther than gross misconduct" as "an act or omission by an employee which constitutes a breach of the employee's duties or obligations to the employer [or] a breach of the employment agreement or contract, or which adversely affects a material employer interest," including "those acts where the severity, degree, or other mitigating circumstances do not support a finding of gross misconduct." *Id.* § 312.5. "Other than gross misconduct" is generally referred to as "simple misconduct." *Lynch v. Masters Sec.*, 126 A.3d 1125, 1130 (D.C. 2015).

Although the regulations "might seem to permit a finding of misconduct based on virtually any conduct that falls short of an employer's reasonable expectations," the regulations "are not to be read so broadly." *Tyler*, 75 A.3d at 214. "Because our unemployment-compensation law was designed to protect employees from the consequences of temporary unemployment, we read the definition of misconduct with an eye towards the statute's humanitarian purpose." *Id.* Thus, a finding of misconduct requires more than "that the employer was justified in [its] decision to discharge the employee." *Id.* (internal quotation marks omitted). In addition, "[m]ore than mere negligence by an employee is required for a finding of misconduct." *Id.* Rather, misconduct requires "[i]ntentionality or conscious

disregard amounting to recklessness" and may be demonstrated by "intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer." *Id.* (internal quotation marks omitted).

## A. Gross Misconduct

Fort Myer contends that the ALJ could not reasonably have credited Mr. Briscoe's testimony that he intended his actions to benefit Fort Myer. In support of that contention, Fort Myer makes a number of more specific arguments: (1) the ALJ discredited Mr. Briscoe's testimony that he did not direct Mr. Spada to sign Ms. Ginyard's ticket but instead told Mr. Spada to talk to another supervisor; (2) Mr. Briscoe's testimony that he was acting out of a concern to protect Fort Myer from a discrimination claim was an after-the-fact explanation; (3) Mr. Briscoe did not take reasonable steps to investigate Ms. Ginyard's complaint and was not certain that any discrimination actually occurred; (4) Mr. Briscoe did not follow proper procedures for handling a discrimination complaint; (5) by directing Mr. Spada to sign Ms. Ginyard's ticket, rather than signing the ticket himself, Mr. Briscoe concealed his involvement in the incident; and (6) Mr. Briscoe's acts did not in fact benefit Fort Myer.

These are legitimate considerations going to Mr. Briscoe's credibility, but we conclude that they do not suffice to overcome the deference this court owes to the ALJ as the finder of fact. *See, e.g.*, *Butler v. Metro. Police Dep't*, 240 A.3d 829, 839 (D.C. 2020) ("Credibility determinations are within the discretion of the [ALJ], and typically are entitled to great weight due to the ALJ's unique ability to hear and observe witnesses first hand.") (internal quotation marks omitted). We conclude that the ALJ could reasonably find that Mr. Briscoe directed Mr. Spada to sign Ms. Ginyard's ticket out of a desire to protect Fort Myer's interests.

In arguing to the contrary, Fort Myer invokes the maxim "falsus in uno, falsus in omnibus." *The Santissima Trinidad*, 20 U.S. 283, 339 (1822). That maxim means "false in one thing, false in everything." *Kinard v. United States*, 416 A.2d 1232, 1233 (D.C. 1980). In its strongest form, the maxim was embodied in an instruction that juries were required to disregard all of the testimony of a witness who they believed intentionally testified falsely on a material point. *Id.* at 1233-34. That "harsh rule was never widely followed" in the United States. *Id.* at 1234. In *Kinard*, this court held that juries should not be instructed about the maxim even in a weaker permissive form authorizing juries to apply the maxim if they chose to do so. *Id.* at 1234-36. In sum, factfinders in this jurisdiction are "free to reject all or part of a witness'[s] testimony." *Id.* at 1235. We see no basis upon which to second-guess

the ALJ's determination in the present case to credit Mr. Briscoe's testimony in part and discredit Mr. Briscoe's testimony in part.

Fort Myer also argues that the ALJ failed to give "exacting scrutiny" to Mr. Briscoe's testimony. Fort Myer initially based this argument on the premise that the ALJ's findings were "based exclusively on hearsay." *R.B. v. U.S. Env't Prot. Agency*, 31 A.3d 458, 463 (D.C. 2011). Fort Myer appears to have abandoned that premise in its supplemental reply brief. Instead, Fort Myer argues that the ALJ ought to have given exacting scrutiny to Mr. Briscoe's testimony because the testimony was uncorroborated and false on a central point. We conclude that the ALJ appropriately gave careful scrutiny to Mr. Briscoe's testimony and reasonably explained the ALJ's credibility determinations.

It is not entirely clear whether Fort Myer also argues that Mr. Briscoe engaged in gross misconduct even on the facts as the ALJ found them. In any event, we hold that the facts as found by the ALJ do not support a finding of gross misconduct, essentially for the reasons stated by the ALJ: the conduct did not have a significant adverse effect on Fort Myer's operations; no resources were misappropriated; the conduct was an isolated incident; Mr. Briscoe was motivated in part by a desire to avoid a discrimination complaint that could shut down Fort Myer; Mr. Briscoe did

not personally benefit; and Mr. Briscoe had seen other Fort Myer supervisors correct pay issues in similar circumstances.

"In order to demonstrate that an employee's actions amounted to gross misconduct, more than willful poor performance must be shown; an employer must make a heightened showing of seriousness or aggravation, lest the statutory distinction between gross and simple misconduct be erased." *Scott v. Behav. Rsch. Assocs., Inc.*, 43 A.3d 925, 931 (D.C. 2012) (footnote, ellipses, and internal quotation marks omitted). We can agree that Mr. Briscoe's conduct was lacking in some respects, and we do not question that Fort Myer was within its rights to terminate Mr. Briscoe. Mr. Briscoe (1) could have referred the matter to a supervisor, as he claimed to have done by directing Mr. Spada to speak to one; (2) he could have investigated the situation more carefully before acting; and (3) his approach appears to have been inconsistent with the training Fort Myer had given to its employees. The ALJ's findings, however, indicate that Mr. Briscoe acted in a good-faith belief that he was protecting Fort Myer's interests by taking steps similar to those he had seen other (albeit higher-up) Fort Myer supervisors take in analogous circumstances.

Those findings, in our view, foreclose a conclusion of gross misconduct. *Cf., e.g.*, *Scott*, 43 A.3d at 935 & n.33 (holding that failure to cooperate with employer's investigation into incident at home for disabled adults was not gross misconduct, because, among other things, conduct was not repeated, did not result in prejudice to employer, and "pales in comparison to cases in which this Court has upheld findings of gross misconduct") (citing *D.C. Dep't of Mental Health v. Hayes*, 6 A.3d 255, 259 (D.C. 2010) (holding that employee's conviction for possession of controlled substance constituted gross misconduct)); *Brown v. Hawk One Sec., Inc.*, 3 A.3d 1142, 1147-48 (D.C. 2010) (affirming ALJ's finding of gross misconduct where employee, who was high-school special police officer, fought with another officer in school hallway while both were on duty); *Badawi v. Hawk One Sec., Inc.*, 21 A.3d 607, 610 (D.C. 2011) (holding that security guard's removal of firearm while on duty and placing it unsecured desk was not gross misconduct, because, among other things, incident was "isolated" and did not result in serious consequences to employer).

## B. Simple Misconduct

The ALJ initially concluded that Mr. Briscoe engaged in simple misconduct but not gross misconduct. When Fort Myer filed a petition for review of that ruling,

Mr. Briscoe did not file a cross-petition seeking to challenge the ALJ's ruling that Mr. Briscoe engaged in simple misconduct. To the contrary, his initial brief in this court expressly stated that Mr. Briscoe was not challenging the determination that he engaged in simple misconduct. Only after the record was remanded and supplemented did Mr. Briscoe argue for the first time that he did not engage in misconduct at all.

Ordinarily, a party that wishes to alter a judgment must itself file a notice of appeal, a cross-appeal, a petition for review, or a cross-petition for review. *See District of Columbia v. Chinn*, 839 A.2d 701, 712 n.10 (D.C. 2003) ("[W]e recognize the well-settled rule of practice that on an adversary's appeal, a party may not challenge or seek to enlarge a judgment without a timely cross-appeal."); *Bath Iron Works Corp. v. White*, 584 F.2d 569, 573 n.2 (1st Cir. 1978) (Respondent who failed to file cross-petition was "precluded now from attacking the Board's decision in an attempt to enlarge his rights thereunder.").

The cross-appeal/cross-petition rule "is not jurisdictional, however, and we have held that it can yield in appropriate circumstances." *In re Gardner*, 268 A.3d 850, 859 n.17 (D.C. 2022). Fort Myer did not raise a procedural objection in its supplemental reply brief to Mr. Briscoe's challenge to the ALJ's conclusion that Mr.

Briscoe engaged in simple misconduct. Fort Myer did raise such an objection at oral argument, but "[w]e generally do not consider arguments raised for the first time at oral argument." *Brookens v. United States*, 182 A.3d 123, 133 n.18 (D.C. 2018).

Under the circumstances, we consider Mr. Briscoe's challenge to the ALJ's conclusion that Mr. Briscoe engaged in simple misconduct. We do so for four reasons. First, having itself failed to object in a timely fashion to Mr. Briscoe's belated argument, Fort Myer is ill-positioned to object to the belated nature of Mr. Briscoe's argument. *Cf., e.g.*, *Sims v. United States*, 213 A.3d 1260, 1267 n.11 (D.C. 2019) (by failing to argue that appellant's argument was not properly preserved at trial, "the government has waived the waiver") (internal quotation marks omitted). Second, after we remanded the record, the ALJ issued a new order addressing simple misconduct in light of additional evidence presented on remand. It is understandable that the additional evidence and new order might cause Mr. Briscoe to reconsider his initial decision not to challenge the ALJ's earlier ruling on the point. Third, because we remanded the record, rather than the case, Mr. Briscoe had no occasion to file a petition or cross-petition after the ruling on remand. *Cf. Bell v. United States*, 676 A.2d 37, 41 (D.C. 1996) (after record remand, no new notice of appeal is required). Finally, the simple-misconduct determination is a legal question that we review de novo. *Gilmore v. Atl. Servs. Grp.*, 17 A.3d 558, 562 (D.C. 2011).

On the merits, we agree with the ALJ's determination—based on the credited evidence—that Mr. Briscoe engaged in simple misconduct. Recall that simple misconduct includes circumstances where an employee acts with "substantial disregard . . . of the employee's duties and obligations to the employer." *Tyler*, 75 A.3d at 214 (quoting *Capitol Enter. Servs., Inc. v. McCormick*, 25 A.3d 19, 27 (D.C. 2011)). In other words, the question is whether the employee, intentionally or recklessly, substantially "disregarded the employer's expectations for performance." *Jadallah v. D.C. Dep't of Emp. Servs.*, 476 A.2d 671, 675 (D.C. 1984) (quoting *Keep v. D.C. Dep't of Emp. Servs.*, 461 A.2d 461, 463 (D.C. 1983)). Here, where Mr. Briscoe's conduct not only disregarded his employer's policies but also amounted to an attempted misappropriation of Fort Myer's funds, we uphold the ALJ's conclusion that he substantially disregarded his duties and obligations to Fort Myer, and that he did so intentionally or recklessly.[1]

---

[1] Contrary to our dissenting colleague's view that the ALJ did not make an explicit finding on this point, the ALJ made clear that Mr. Briscoe "intentionally disregarded [his] employer's expectation" and "understood the conduct at issue could lead to discharge." It is true that this finding was divided into two consecutive sentences, as the dissent points out, but the finding is no less explicit for that. It is worth quoting those two sentences from the ALJ's order in full, so the reader can judge for themselves: "Any misconduct disqualification requires proof that a claimant intentionally disregarded an employer's expectation and proof that the claimant understood the conduct at issue could lead to discharge. Based on the record in this case, I find that Employer established that [Mr. Briscoe] engaged in disqualifying misconduct." In our view, a reviewing court cannot reasonably

Although Mr. Briscoe credibly testified that he acted with the goal of forestalling a discrimination lawsuit—thereby saving him from a finding of gross misconduct, as discussed in Part II.A—there is ample support for the ALJ's conclusion that Mr. Briscoe substantially exceeded his authority when attempting to do so, and knew or recklessly disregarded a risk that he was doing so. First, rather than prepare and sign Ms. Ginyard's ticket himself, Mr. Briscoe directed a subordinate (Mr. Spada) to sign it, notwithstanding the fact that Mr. Briscoe typically signed time sheets while Mr. Spada lacked that authority. This attempt to distance himself from the ticket strongly supports the ALJ's conclusion that Mr. Briscoe understood that he was overstepping his authority. Second, in his testimony Mr. Briscoe consistently denied directing Mr. Spada to sign the ticket, claiming instead that he reprimanded Mr. Spada for the schedule change and explained that Ms. Ginyard would likely have to be paid for the Sunday shift, but nonetheless directed him "not [to] sign the ticket" until he "talk[ed] to a higher level" supervisor. Mr. Briscoe was discredited on that point, however, so his refusal to acknowledge that he directed Mr. Spada to sign the timesheet can be understood as consciousness of guilt, further supporting that Mr. Briscoe understood he had engaged in

---

demand a more precise and express finding that Mr. Briscoe intentionally disregarded his duties than that.

misconduct when he did so. Third, Fort Myer offered unrebutted testimony that its employees all received annual training on the company's non-discrimination policy, which included specific instructions that reports of discrimination be immediately passed on to the human resources department. As its representative explained in her testimony, this policy "protects the company," and she verified that Mr. Briscoe had attended this training.[2]

Our dissenting colleague views the evidence and the ALJ's findings differently. As the dissent recounts, there is a sentence in the ALJ's factual findings on remand stating that Mr. Briscoe had seen other supervisors correcting payment problems and therefore "believed he could do the same thing." The best understanding of this finding, and the one consistent with the evidence before the ALJ, is that Mr. Briscoe thought he could correct the payment problem and have Ms. Ginyard paid (i.e., "do the same thing") in precisely the manner he claimed:

---

[2] The ALJ credited Mr. Briscoe's testimony that he had seen others defy that training, and we do not doubt that frequent conduct in defiance of formal training might create an atmosphere where an employee reasonably believes the rules in handbooks and formal trainings are not, in fact, the rules on the ground. But that point cannot save Mr. Briscoe from a finding of simple misconduct here, where Mr. Briscoe's credited testimony was that he had seen individuals who (unlike him) "ran the asphalt division" take that course of action, and Mr. Briscoe did not claim to believe that he had the authority to do likewise. In fact, he insisted that he had not done so and instead referred Mr. Spada to a higher level supervisor.

instructing Mr. Spada that the schedule change was impermissible, telling him they would probably have to pay Ms. Ginyard for the shift, and directing him to speak to a "higher level" superintendent before signing the ticket.[3]

The dissent instead reads that sentence as a finding that Mr. Briscoe believed he was *authorized* to do exactly what he repeatedly insisted he had not done—direct Mr. Spada to sign the ticket without speaking to a higher-up.[4] The record could not

---

[3] The dissent counters that it would be illogical to read the sentence in this manner because it was not relevant "whether Mr. Briscoe believed that he could do something that the ALJ found he did not do." That might be a persuasive point if the ALJ had put any emphasis on this sentence in its findings of fact, or if it had even repeated it in its legal analysis, but it did neither. It is not surprising that some sentences (many, in fact) in the ALJ's recounting of the facts did not speak to the ultimately dispositive issue in the case. And when it came time to apply the facts to the law, the ALJ made herself clear that Mr. Briscoe "intentionally disregarded [his] employer's expectation."

[4] When the ALJ stated that Mr. Briscoe thought he "*could* do the same thing" that he had seen previous supervisors do—even if we read "the same thing" as the dissent does—she seems to have meant only that he thought he "was capable of" having Ms. Ginyard paid, not that he thought he "was authorized to" accomplish that end through any particular means. We see no reason to read the word "could" as bearing the normative quality the dissent must attribute to it to arrive at its conclusion, as the word typically does not bear that meaning (though it can). To illustrate, when Marlon Brando's character said "I coulda been a contender" in ON THE WATERFRONT, he was not commenting on his prior authorization to become a contender, but only on his prior capacity to become one. Reading the sentence sans any normative gloss would not render it irrelevant to the legal issues before the ALJ, as the dissent contends: What Mr. Briscoe thought he could accomplish is directly relevant to the gross misconduct inquiry of whether Mr. Briscoe intended his actions to benefit Fort Myer. By simply reading the word "could" in its more typical positive sense rather than a normative one, the dissent's critiques of our above-the-line

support such a finding, which is reason enough to reject the dissent's understanding of this isolated sentence;[5] Mr. Briscoe unsurprisingly never suggested he believed he was authorized to do the thing he was emphatic he had not done.

The dissent's reading of this sentence from the ALJ's order, which underlies each of its counterarguments, is also inconsistent with the ALJ's bottom line that Mr. Briscoe "intentionally disregarded [his] employer's expectation" when he directed Mr. Spada to sign the ticket and "understood the conduct at issue could lead to discharge." That was the basis for the ALJ's finding of simple misconduct, despite its conclusion (favorable to Mr. Briscoe) that he "was motivated by a desire to protect [Fort Myer's] interests." So it makes no sense to read the sentence the dissent homes in on as reaching the opposite and unsupported conclusion—that Mr. Briscoe believed he was permitted to direct Mr. Spada to sign the ticket himself—

reading wash away and this sentence the dissent constructs its argument upon is rendered harmonious with the evidence and the remainder of the ALJ's findings.

[5] The dissent counters that this finding was not isolated where the ALJ later repeated that Mr. Briscoe "had seen other supervisors, 'correct pay issues under similar circumstances.'" But that loses the thread because it says nothing about Mr. Briscoe's belief in his own authority—as a subordinate of everybody he had seen correct pay issues themselves, which he insisted he had not done himself—to do likewise. There is just one sentence fragment that the dissent relies upon as support for its reading of the ALJ's order on that critical question—he "believed he could do the same thing"—and for reasons already articulated, the dissent misreads even that fragment.

particularly where Mr. Briscoe never even contested before the ALJ that he had committed simple misconduct if in fact he had directed Mr. Spada to sign the ticket himself (he maintained only that he had not done so). And even if we were to attribute this clearly erroneous and internally inconsistent factual finding to the ALJ, that would not alter our conclusion that Mr. Briscoe engaged in simple misconduct because the record evidence permits but one conclusion: he knew that by directing Mr. Spada to sign the ticket, he substantially exceeded his authority and defied Fort Myer's expectations of him.

For the foregoing reasons, we affirm OAH's ruling.

*So ordered.*

McLEESE, *Associate Judge*, concurring in part and dissenting in part: I agree with the court that Mr. Briscoe did not commit gross misconduct. I therefore join Parts I and II.A of the opinion for the court. I also agree with the court's decision to consider Mr. Briscoe's belated claim that he did not commit simple misconduct. *Supra* at 15-17. I respectfully dissent, however, from the court's conclusion on the merits that Mr. Briscoe did commit simple misconduct. *Id.* at 18-23.

As the court acknowledges, *supra* at 9, we must accept the findings of the ALJ if those findings are supported by substantial evidence. The ALJ in this case found that Mr. Briscoe "was motivated to protect" Fort Myer from a discrimination claim, had seen other supervisors "correct pay issues under similar circumstances," and "believed he could do the same thing in this situation." In my view, the record adequately supports those findings. Taking those findings as a given, it seems to me that Mr. Briscoe did not commit simple misconduct.

As the court also acknowledges, *supra* at 10, a finding of misconduct requires more than "that the employer was justified in [its] decision to discharge the employee." *Tyler v. George Washington Med. Fac. Assocs.*, 75 A.3d 211, 214 (D.C. 2013) (internal quotation marks omitted). In addition, "[m]ore than mere negligence by an employee is required for a finding of misconduct." *Id.* Rather, misconduct requires "[i]ntentionality or conscious disregard amounting to recklessness" and may be demonstrated by "intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer." *Id.* (internal quotation marks omitted). In my view, the ALJ's specific findings foreclose the conclusion that Mr. Briscoe intentionally or recklessly disregarded his duties to Fort Myer. *Cf. Lynch v. Masters Sec.*, 126 A.3d 1125, 1128-37 (D.C. 2015) (security guard who left firearm unattended in public bathroom did not engage in misconduct;

"[O]rdinary negligence in failing to perform work in accordance with the employer's standards, rules, or expectations is not misconduct, gross or otherwise, within the meaning of the [unemployment-compensation statute].").

In concluding otherwise, the court describes the ALJ as having concluded that Mr. Briscoe "knew or recklessly disregarded a risk" that his conduct exceeded his authority. *Supra* at 19. I do not see any such explicit finding in the ALJ's decision, and the opinion for the court does not point to any such finding. Rather, the ALJ's explicit findings about Mr. Briscoe's mental state, noted above, in my view point in the opposite direction.

The court states that the ALJ "made clear that Mr. Briscoe 'intentionally disregarded [his] employer's expectation' and 'understood the conduct at issue could lead to discharge.'" *Supra* at 18 n.1. I disagree. In the first sentence quoted by the court, the ALJ describes the general requirements of a finding of misconduct, not Mr. Briscoe's particular mental state. It is true that the following sentence states the ALJ's conclusion that Mr. Briscoe engaged in misconduct. That sentence does not specifically state that the ALJ was finding that that Mr. Briscoe knowingly or recklessly disregarded the risk that his conduct was unauthorized. If nothing else pointed to the contrary, it would nevertheless be reasonable to believe that the ALJ

was implicitly making such a finding. As I have explained, however, the ALJ's specific findings as to Mr. Briscoe's mental state are to the contrary. I therefore do not understand the ALJ to have implicitly found, in contradiction to its explicit findings, that Mr. Briscoe knowingly or recklessly engaged in unauthorized conduct.

The court expresses the view that "a reviewing court cannot reasonably demand a more precise and express finding" than the ALJ provided in this case. *Supra* at 18 n.1. I have noted the ALJ's precise and express findings as to Mr. Briscoe's mental state, and I have tried to explain why those findings foreclose a determination of intentional or reckless misconduct. What the court relies upon is not a "precise and express" finding as to Mr. Briscoe's mental state, but rather two sentences in which the ALJ states the applicable legal standard and summarizes its conclusion under that standard without making any explicit finding that Mr. Briscoe acted intentionally or recklessly. The court then elevates those two sentences over the trial court's actual precise and express factual findings. As I will explain, in doing so, the court relies on a set of factual inferences that the ALJ never actually made and adopts what is in my view an implausible interpretation of the ALJ's actual findings. In my view, giving effect to the ALJ's "precise and express" findings supports reversal rather than affirmance.

The court also describes Mr. Briscoe's conduct as "attempted misappropriation," *supra* at 18, as did the ALJ. Those references, however, seem inconsistent with the ALJ's specific findings about Mr. Briscoe's mental state. Although the term "misappropriation" can have various meanings in various contexts, the term's ordinary meaning requires two things that the ALJ found were not present here: that another's property was taken or used (1) dishonestly; and (2) for one's own use. *See, e.g.*, *Rupcich v. UFCW Int'l Union*, 833 F.3d 847, 858 (7th Cir. 2016) (citing dictionary definition of "misappropriate" as "appropriate dishonestly for one's own use"); *Black's Law Dictionary* 1148 (10th ed. 2014) (defining "misappropriation" as "The application of another's property dishonestly to one's own use."). In addition, because Fort Myer's money was not actually appropriated, Mr. Briscoe's conduct must be viewed through the prism of attempt, as the ALJ and the court both acknowledge. *Supra* at 19. Generally, to constitute an attempted offense, a party's conduct must have been intended to commit that offense. *E.g.*, *Newman v. United States*, 49 A.3d 321, 324 (D.C. 2012). The ALJ in this case found, however, that Mr. Briscoe believed that he could permissibly do what he did. That finding is incompatible with a conclusion that Mr. Briscoe's conduct constituted attempted misappropriation.

The court presents an alternative interpretation of the ALJ's finding that Mr. Briscoe believed that he could permissibly do what he did. Specifically, the court suggests that the ALJ was actually finding that Mr. Briscoe believed that it was permissible for Mr. Briscoe to tell Mr. Spada to take no further action until Mr. Spada spoke to a higher-level supervisor. *Supra* at 20-23. I do not view that as a plausible interpretation of the ALJ's finding. The ALJ's finding was that, "[b]ecause [Mr. Briscoe] had seen management correcting a problem by paying the employee, [Mr. Briscoe] believed he could do the same thing in this situation." As a matter of grammar, "the same thing" in that sentence refers to "correcting a problem by paying the employee." It cannot plausibly be read to mean a completely different thing (i.e., telling Mr. Spada to consult with a higher-level supervisor) that the ALJ found Mr. Briscoe in fact did not do. As a matter of logic, moreover, whether Mr. Briscoe believed that he could do something that the ALJ found he did not do was not relevant to the misconduct inquiry. The relevant issue before the ALJ was what Mr. Briscoe believed about what he actually did, and the ALJ explicitly found that Mr. Briscoe believed that he could "correct[] a problem by paying the employee." For essentially the same reasons, I also view as implausible the second alternative interpretation of the ALJ's finding suggested by the court: that the ALJ was simply finding that Mr. Briscoe believed it was possible (but not permissible) for him to correct the problem at issue. *Supra* at 21 n.4.

The court responds to this point by (1) implicitly acknowledging that the ALJ had no logical reason to make a factual finding about what Mr. Briscoe believed about something Mr. Briscoe did not actually do; (2) suggesting that this was a stray finding that played no role in the ALJ's substantive analysis; and (3) stating that the ALJ, when applying the law to the facts, made clear that Mr. Briscoe intentionally engaged in misconduct. *Supra* at 22 n.3. I disagree with both of the last two points. When applying the law to the facts, the ALJ reiterated its favorable finding about Mr. Briscoe's mental state, explaining that Mr. Briscoe had seen other supervisors "correct pay issues under similar circumstances." The court suggests that no "thread" connects the ALJ's explicit findings as to Mr. Briscoe's mental state with ALJ's assessment of Mr. Briscoe's culpability. *Supra* at 22 n.5. I disagree. The quoted statement would be irrelevant to the analysis of Mr. Briscoe's culpability if it meant only that Mr. Briscoe had seen supervisors do something quite different and did not believe that he could permissibly do what he did. In my view, there is a clear logical thread connecting the ALJ's findings and the quoted statement. In fact, the place where the thread is lost is where the ALJ discusses the specific basis for concluding that Mr. Briscoe committed misconduct. In that discussion, which spans six paragraphs, the ALJ makes no mention of whether Mr. Briscoe acted recklessly or knowingly, instead simply concluding that Mr. Briscoe's conduct was "a violation of employer's interest and expectation."

Thus, in my view it is not accurate to refer to the ALJ's explicit finding about Mr. Briscoe's mental state as an "isolated" sentence not relied upon in the ALJ's legal analysis. *Id.* at 21-22 & n.3. Conversely, none of the statements the court relies upon were made when the ALJ was either making factual findings or applying the law to the facts.

The court concludes that the record does not support the ALJ's finding that Mr. Briscoe believed he could resolve the problem by directing that Ms. Ginyard be paid. *Supra* at 21-22. I disagree. The court's reasoning appears to be (1) Mr. Briscoe denied having directed that Ms. Ginyard be paid; (2) Mr. Briscoe never directly testified that he believed that he would have been authorized to do that; and (3) in the absence of such testimony, a reasonable factfinder could not infer that Mr. Briscoe believed he could direct payment to Ms. Ginyard. *Id.* I part company with the court on the last step of that reasoning. It seems to me that a reasonable fact-finder could infer, as the ALJ did here, that although Mr. Briscoe inaccurately denied having directed that Ms. Ginyard be paid, Mr. Briscoe nevertheless had a good-faith belief that he could permissibly do so. Some of Mr. Briscoe's testimony spoke generally to the propriety of paying employees to solve problems: "Q Did you think that paying [Ms. Ginyard] for the shift was consistent with Fort Myer policies? A Yes. Q Why did you think it was okay to pay [Ms. Ginyard] for that shift according

to Fort Myer policies? A Because I've seen it numerous times." It is true Mr. Briscoe's testimony also indicated that the decision to pay Ms. Ginyard would appropriately be made by a higher-up supervisor. As the court itself notes, however, *supra* at 12, factfinders are "free to reject all or part of a witness'[s] testimony." *Kinard v. United States*, 416 A.2d 1232, 1233 (D.C. 1980). In my view, a reasonable fact-finder could conclude, as the ALJ did in this case, that Mr. Briscoe believed he could permissibly direct that Ms. Ginyard be paid.

In concluding that Mr. Briscoe knowingly or at least recklessly violated his duties to Fort Myer, the court relies on four factual points. *Supra* at 19-20. I do not view those points as dispositive.

First, the court states that Mr. Briscoe's conduct in directing Mr. Spada to sign the "ticket" at issue "strongly supports" an inference that Mr. Briscoe understood that he was overstepping his authority. *Supra* at 19. I agree that a factfinder could reasonably have drawn that inference. As previously noted, however, the ALJ reached the opposite conclusion, finding that Mr. Briscoe had seen other supervisors "correct pay issues under similar circumstances" and "believed he could do the same thing in this situation." We are not factfinders, and in my view the court lacks authority to substitute its own factual inference for the reasonable contrary

conclusion of the ALJ. *See, e.g.*, *Hamilton v. Hojeij Branded Food, Inc.*, 41 A.3d 464, 473 (D.C. 2012) ("It is incumbent upon us, in this case as in any other, to eschew appellate fact-finding.") (internal quotation marks omitted).

I have the same view about the remaining factual points made by the court: (1) Mr. Briscoe's denial of directing Mr. Spada to sign the ticket "can be understood as consciousness of guilt," *supra* at 19; (2) there was evidence that Mr. Briscoe received training that directed employees to inform the human-resources department of complaints of discrimination, *id.* at 20; and (3) the prior examples that Mr. Briscoe relied upon involved individuals who, "unlike" Mr. Briscoe, "ran the asphalt division," *id.* at 20 n.2. Although a fact-finder could reasonably consider those facts as supporting a conclusion that Mr. Briscoe knowingly or recklessly acted without authorization, the ALJ in this case reasonably concluded, to the contrary, that Mr. Briscoe believed that he could do what he did.

For the foregoing reasons, I respectfully dissent from the court's conclusion that Mr. Briscoe committed simple misconduct that disqualified Mr. Briscoe from certain unemployment benefits.